Case No. 24-1846, 24-1971, USA v. Bernard Shelton Argument not to exceed 15 minutes per side. Mr. Donini, you may proceed for the appellant. Good morning, Your Honors. May it please the Court. I'm going to start with the statutory language because I think it's important. So the relevant statute here is 21 U.S.C. 841 and it states... Mr. Donini, I'm sorry to interrupt you right away. Yes, Judge. But I have a note here that you are reserving three minutes for rebuttal. Is that correct? Correct. I'm sorry. Yes, three minutes for rebuttal. So the statute again, 21 U.S.C. 841, and it states, except as authorized by this subchapter. That's important and I'm going to come back to it. It shall be unlawful for any person, knowingly or intentionally, to distribute or dispense a controlled substance. Now, this statute is primarily used to prosecute drug dealers on the streets. And so if we omit that first clause, this statute is very plain and very straightforward. You can't distribute drugs. But obviously we have a robust healthcare industry in the United States and across the globe. And we want our doctors prescribing medications to patients to treat their ailments. We want pharmacists to fill those prescriptions. So we have to authorize them to do so. And Dr. Shelton was indeed authorized, as a medical professional, as a licensed doctor, to distribute drugs, both by the State of Michigan and he also had his DEA registration. Now, RUAN is obviously an important Supreme Court decision in this space, issued not too long ago. And I'd purport that the most important part of the Supreme Court's decision in RUAN was to say that that knowingly or intentionally mens rea language applies to the except as authorized clause. And they go on to say that this means that once a defendant meets the burden of producing evidence that his or her conduct was authorized, and again, Dr. Shelton did and that's stipulated in this case, the government must prove beyond a reasonable doubt that the defendant knowingly or intentionally acted in an unauthorized manner. And the Supreme Court also observed in that RUAN case that a stronger scienter requirement, so they were trying to make sure that the scienter required to be proven in the cases like these against doctors, a strong scienter requirement helps to diminish the risk of over-deterrence, i.e. punishing acceptable and beneficial conduct that lies close to, but on the permissible side of the criminal line. I'd say that both Congress and the Supreme Court are signaling that this statute is being overused by prosecutors in terms of their prosecution of medical professionals, doctors, such as Dr. Shelton. Counsel, can I just, I guess, focus on whether the, I don't know if you're getting to the jury instruction argument first, we can start there, but how were these instructions, we know RUAN, this court has weighed in Anderson, Bauer, these other cases, how were these instructions erroneous under those cases? So, Your Honor, I'll turn to the language explicitly because I think it's important to walk through what the judge, what Judge Hood actually instructed the jurors in this case. But I would say that the problem primarily with the instructions as delivered was that she injected an objective standard into the elements themselves. Is that the legitimate medical purpose and usual course of professional practice? Correct. Did you not ask for that, Record Entry 172? Well, Your Honor, I was not trial counsel at the time. You're trial counsel now? Yeah, that's fair. I believe there were negotiations back and forth. There was an objection filed, it's in the record, by trial counsel. And there was some certainly massaging, as always happens when there's jury instruction back and forth. But I would say that the thrust of what defense counsel was proposing was for a subjective standard to be in place in this case. And an objective standard was inserted, and I would say inserted impermissibly based on the Ruan decision. Well, can we slow down on that? Because I have that exact same question. It wasn't clear to me whether, not you, but defense counsel acquiesced after the court first issued or sent out to the parties the instructions that it intended to give. The government maybe changed those a little bit, said this is what we want. I couldn't tell, frankly, what defense counsel did or didn't do. But I think it makes a difference for purposes of whether or not you got your objection in the way that you needed to get the objection in, and then worked with what you had from that point, or whether you acquiesced in the language that you're now telling us is improper language to include. Yeah, Your Honor, I'd say that there was back and forth. I believe that the issue was properly preserved. The fight on this particular instruction is always, you know, in play in terms of what are we going to instruct the jury on how they need to interpret this particular statutory language. And so there was a lot of activity around this. There was back and forth. I believe the issue is preserved. So I believe that, and in our briefing we say it's de novo review. It should not be that it was waived. And so abuse of discretion. Obviously then Bauer and cases, Anderson, come into play. And I don't believe that's the case here. I do believe it was preserved. I believe Mr. Minnick did all that he could to get the proper instruction based on the Ruan decision of subjective intent needing to be paramount and proven. That Dr. Shelton knew that he was prescribing for an unauthorized purpose, which means a non-medical purpose. And the evidence introduced at trial, I believe all pointed to the fact that B7 patients, which were the subject of the trial, all had legitimate medical conditions that the prescribing that Dr. Shelton gave was appropriate for. If I can turn to the language of the instructions, I think, again, my point would be primarily there were three different times where Judge Hood read in the language of, which would be the objective language, which I would argue is the improper language of legitimate medical purpose in the usual course of professional service. That comes directly from Mr. Shelton's proposed. If that's your objection, that legitimate is entailing an objective standard as opposed to a subjective standard, then I do think there's a preservation problem. Because, I mean, number two of the proposed jury instruction at 172.1 says a doctor is authorized to issue a prescription if he does so for a legitimate medical purpose in the usual course of professional practice. That's verbatim the instruction that the district court gave. And then I think the district court recognized the Ruan standard by saying you must knowing and intentionally act in a manner that's unauthorized. And it wasn't until your post-trial briefing that we saw kind of the argument about legitimate itself is entailing an inappropriate objective standard. So can you respond to kind of, if that's how I understand the course of events, can you respond to that preservation problem? Yes, Your Honor, I'll do my best. So, look, this is a complicated area. This language becomes very difficult because, again, I would argue that the primary purpose of this statute is to combat the drug dealers on the streets. And so we have this accept as authorized language that then allows for doctor prosecution, essentially, or pharmacist or any medical health professional. These terms that come from the regulation are appropriate to come from the statute. They are allowed to come in during a criminal case of this nature. However, they can't be definitional. They can't be elemental. They are allowed to come in as circumstantial evidence to prove a defendant's subjective intent. So there's not a problem, per se, with introducing that language as part of a jury instruction. Because then it's not improper for the government or the defense to call other medical professionals to talk about the prescribing that occurred in that case. But what is important in my mind, what is distinct in my mind, is that that has to be made clear that those generally accepted principles, generally accepted professional practice type of evidence is only circumstantial evidence to prove a defendant's subjective intent. That has to be clear. That has to be paramount. And again, just going to the second element. So the jury instructions that were given, and this is ECF 199, page ID 4047. Again, usual course, legitimate medical purpose, and the usual course is at the beginning. I don't want to spend too much time on the instructions. Then we go into the first element. Well, excuse me. So first, she says, a doctor is authorized to issue a prescription if he does so for a legitimate medical purpose in the usual course of professional service. That's okay. I'd rather have subjective intent, what the doctor subjectively believed in terms of authorization. That should have been the definition there. But I think where we come in, first element is that he distributed the drugs. That's obvious, and that was not an issue in the case. Here's the problem in my mind, Your Honor. Number two, that the particular prescription was unauthorized. That is not for a legitimate medical purpose in the course of professional practice. That's just the flip side of the instruction that was proposed. I mean, Dr. Shelton's counsel proposed an instruction that said that the particular prescription was unauthorized. A doctor is authorized to issue a prescription if he does so. So to me, number two is just saying the same thing, but in the converse way. And then on top of that, you go down and the district court instructed it is not enough for the government to prove that the defendant acted without a legitimate medical purpose or outside the usual course, and instructed as to the subjective knowledge standard. Right, and I would say that the it is not enough language is where the circumstantial piece comes in. It's circumstantial evidence of a defendant's subjective intent that he or she acted unauthorized. In my mind, by defining unauthorized as not for a legitimate medical purpose in the usual course of professional practice defines unauthorized in an objective way, and that is improper. Even though the court says you have to prove beyond a reasonable doubt that he knew or intended that his conduct was unauthorized. Well, and that's, so yes, that's the language that should have been given, but it's already... It was given. I know, it was given, and it's appropriate, but it was polluted by the earlier definition. So when you say, when you give the language, which is appropriate, that you have to show that the defendant act in an unauthorized manner, you have to prove beyond a reasonable doubt that he or she acted unauthorized. It polluted the definition of authorized via the objective standard. So... You have another question. Go ahead. One last question. I might be sympathetic to your argument as a de novo matter, but we're dealing with cases like Godofsky that I read to reject your subjective good faith argument, and what do you do with that? Like, if we were, say, in an abuse of discretion world, how is an abuse of discretion to give, kind of reject your subjective good faith defense when you have cases like Godofsky on the books? Yeah, your honor, Godofsky is not the best case under an abuse of discretion standard. I agree. I would say that, you know, the government relies on Bauer quite a bit, and I found Bauer to be unfortunate. I think what the court said, what this court said in Bauer is, you know, if the jury was properly instructed, if the jury was properly instructed, it's likely that this defendant would have been found not guilty, or maybe likely is an overstatement. But a properly instructed jury may very well have found this defendant not guilty, and I'd say that that's an unfortunate circumstance. That shouldn't be the case. Thank you, counsel. Thank you, your honors. Thank you. May I please the court? Let's talk about elements two and elements three, because that is the core of what's at stake here. Element two, whether or not the prescription was issued outside the course of professional practice, is an objective standard. The Supreme Court referenced that in the Ruan opinion. I understand the holding of Ruan was the third element. What the mens rea had to be, but the actus reus of this offense is objective. And the Supreme Court said in Ruan, the government can prove this knowledge through circumstantial evidence, and the regulation defining the scope of its prescribing authority does so by reference to objective criteria, such as legitimate medical purpose and usual course of professional practice. We've had over 100 years of precedent saying that the definition of authorization is objective medical evidence. The Moy case from 1920 went through the objective medical evidence. You can't give people huge amounts of morphine. You send them to one particular doctor. You have almost no medical examination. That's outside the course of professional practice. When you have 50 years ago, you have the Moore case, you have the same thing. How did the doctor act outside the course of professional practice? He either didn't examine people or he gave cursor examinations. He was giving them methadone, which is supposed to be for people who are drug addicts. And yet he didn't follow accepted medical procedures. He gave them massive amounts. The more they wanted, the more he gave them, and the more they paid. And so the second element is the objective actus reus of the crime. Now, how do we protect doctors who maybe are stupid or ignorant or make mistakes from being convicted? That's with the third element. That's with the mens rea. And the mens rea says... And so what the defense is doing in this case, really without any authority, is trying to take Ruan's authority, which says it has to be his subjective intent. He has to know they're trying to mix that into the second objective medical element. There's no case that supports that. There's 100 years of Supreme Court precedent that says the opposite. And so it's really kind of frustrating to me to hear him say that objective medicine has no place in these prosecutions. Objective medicine has everything to do in these prosecutions. It shows that the prescription is not authorized and not valid. Then we have the fight subjectively on the third element as to whether he knew he was acting outside his authority. And... Can you define what the standard of care is? Is that a state-by-state inquiry, or is that a kind of general common law nationwide inquiry? Your Honor, I liked the language from the Moore case, which we'd used for many, many years, which basically said, within a standard of medicine, generally recognized and accepted in the United States. And I think that's a great thing, because when you say generally recognized and accepted in the United States, it says, if you find any place where people do this, you're protected. In other words, maybe we have really sophisticated practice in New York, or maybe they're still doing things a little more old-fashioned someplace else. We don't hold you to the New York standard. If they're doing this anywhere, you're covered. Now, the defense objected to that in this case, and Judge Hood took that line out of the second element. I've tried five cases after Juan that have dealt with doctors or pharmacists, and we have this fight in every case. And I think defense counsels don't like that explanation of a nation that has to be accepted somewhere in the United States, because, frankly, what their clients are doing, as Dr. Sheldon did here, isn't accepted anywhere. And so they like to take that out, and they like to have something a little bit vaguer. The defense, in their proposed instructions at one point, specifically asked for one that included legitimate medical practice. So I find that he objects here that it shouldn't have objected to legitimate medical practice. What do you make, counsel, of the arguments about the non-delegation doctrine and the major questions doctrine? Were they late? Tell me your response on these. A couple of responses. First of all, when you look at the statutes themselves, the statutes make it pretty clear that authorization is, of course, a professional practice. It's at pages 46 to 47 of our brief, but 21 U.S.C. 80221 says practitioners can distribute controlled substances in the course of professional practice. That phrase, professional practice, goes all the way back to the Moy case in 1920. And in the Moore case, when they said professional practice means, is it legitimate? Did they do things like examine them? Did any of these cases or our cases squarely grapple with this non-delegation or major questions? The closest you come is the Supreme Court's Gonzalez case when they say, look, the regulation, which says legitimate practice, it really isn't doing anything more than restating these statutes because when it talks about professional practice, that's talking about what doctors really do in the course of their profession. And I would say that by professional practice, you clearly can't just say, well, the person was addicted, they gave them an addiction drug, so that means it's professional practice. That's not been the law. Was the first time the defense raised those doctrines in the post-trial motion? It was, Your Honor. And I would say, so first of all, I think the statutes in the case law for 100 years makes clear. Again, we have 21 U.S.C. 80210, just control substances can be dispensed only under the lawful order of a practitioner. So the regulation is clearly based on these statutes. Gonzalez said the regulation doesn't run more. And then also Gonzalez also recognized that to the extent that the attorney general can impose regulations, 21 U.S.C. 821 says the regulations can control the distributing and dispensing of controlled substances. And Gonzalez said the statutory purpose of those statutes was to combat drug abuse and prevent illicit drug trafficking. That's a pretty clear directive. If you want to combat drug abuse and prevent illicit drug trafficking at a minimum, you ought to be able to write a regulation that says your prescribing has to be for a legitimate medical purpose. Could they in the regulation promulgate through rulemaking a new regulation that does impose a subjective good faith standard? That does or does not? That does. I'm wondering what your view is of the scope of the power under the general rulemaking delegations to the attorney general. What else could they have had 103.06.04 say in your view? What are the outer limits on that power? I think Gonzalez gives a good example of the outer limits. The attorney general can't be in the business of saying what legitimate medical practice is. You can require it to conform to the standard that's accepted in the medical profession, but I think that's a very good dividing line. They may have specific regulations that require specific reporting or specific paperwork requirements. That would seem to be within the scope. But it seems to me Gonzalez, where the attorney general tried to say you can't use controlled drugs for assisted suicide, that was defining what's up to the states and what's up to the medical boards to say the content of the practice. All the attorney general is doing is saying it has to be objectively for a legitimate medical purpose. Could they change that by regulation to a subjective standard? Well, I suppose that would be tough because I think the statutes that we said on page 46 to 47 of the brief talk about lawful orders of practitioners and things in the lawful course of their professional practice. So you'd have to figure out whether they had the power to sort of claw that back and say, you know what, as long as this doctor subjectively thinks he's doing the right thing by giving this drug addict all the methadone he wants, we're giving authorization for that. I have a little bit of trouble with that as a hypothetical thing because I think that the regulation is so tightly bound up with this idea that it has to be objectively, legitimately authorized. And it's just, like I say, I've tried five such cases, every time I fight this in the district court, because counsels say, Rowan says it can't be subjective. Well, that's the third element. And, you know, maybe they were negligent, maybe they were stupid. The instructor... Well, can I circle back and maybe go like one degree away from what Judge Hermendorfer was suggesting? So Brother Counsel has really, in my mind, advocated for what was in Justice Alito's concurrence in Rowan to say this bona fide medical practice, so to speak. And as bona fide, it means that it's for a medically legitimate means of practicing medicine. I really can't discern the difference between that and for a legitimate medical purpose. But circling back to Judge Hermendorfer's question, could the Attorney General write a regulation that aligns with what Justice Alito said is necessary? Which is, I think, more of a subjective. Well, I think the problem is, even with the quote from Justice Alito's concurrence, what it does, it actually mixes the two together. It says, is the mens rea, does it have to be good faith? And then does it have to be good faith in terms of legitimate medical practice, going back to the second element, which is objective. When you put them in the same sentence, it sounds like one thing. And all I really want to emphasize is that when you separate them out to say, was it legitimate medical practice, was it professional practice, as the statute says, the experts say no. What the doctor did, as Dr. Berlin, our expert, said, this is not medical practice. He's endangering these people. He's doing things that he himself said he didn't do and therefore knew he wasn't supposed to do. I think the thrust of Justice Alito's practical concern and federalism concern is that by using an objective standard on element two, you're potentially criminalizing either cutting edge or potentially fringe medicine, experimental medicine in a way that is problematic when we think about federal criminal law interfering with states' abilities to regulate practice. So you could have, I think, in Justice Alito's mind, someone who is experimenting with a drug, they genuinely believe this is going to be the best for their patient, but it might just be not yet accepted by medical consensus. And in your view, that person would be subject to criminal prosecution. What's your response to that? They would not because the regulation also has the expression, which of course wasn't implicated here, legitimate experimentation. So a doctor could very well, within the scope of the authorization, and that's in the regulation, say, look, I'm doing a double-blind experiment. Here's my protocol. I'm getting informed consent. And so you could do that as a doctor. And the Rwandan majority said, look, it's medicine, so there's going to be a gray area. They used the word gray area. And they said that's why element three, that's why the third element has to be subjective and has to be so high. You could still satisfy element three. Let's just use off-label hormone prescriptions, which is a common thing these days. The doctor could know, I understand I'm acting outside the bounds of medical practice here, or even in the way a state has allowed us to prescribe these medications. But nonetheless, so I subjectively know I'm acting outside the bounds of objective reasonableness, but I nonetheless think this is the best thing for my patient. It's not experimental in the same sense that I think you were referencing with the other portions of the regulations. In your view, that person would be prosecutable under 841? They would only be prosecutable if there was no reason to think that this might be a good avenue to go. I mean, people don't just prescribe off-label because they don't wake up. I hope they don't wake up one morning and say, someone's having a really bad sinus headache because of the cold they got, so I think I'm going to try 100 doses of opiates for them and see if that does anything good. I mean, they can say that, well, I'm just doing this off-label and no one else accepts that, but no one's going to believe that. And so they're still subject to prosecution. If they're doing cutting-edge stuff, there has to be some basis for them to do that. There has to be some basis in medicine. And if there is, we have the gray area of the Supreme Court referenced, and that's why the standard is so high of knowingly. And the instruction given here with knowingly means he was conscious and aware, realized what was happening, did not act or fail to act because of ignorance, mistake, or accident. And I understand the Court's worry about hypothetically the best cutting-edge doctor in the world. That's not what we have here. That's not what I've ever seen. What I've seen is doctors who want to make a buck by doing what is objectively not authorized, and they know it. Thank you. Judge Armendaroff, I'm going to pick up where you left off, which is I don't think Mr. Pratt answered your question. I think the answer to the question is it's up to prosecutorial discretion at that point. It's up to the executive branch to decide in those circumstances. And that's not how the law should be written. The law should be clear, and it shouldn't be that the executive gets to decide what's cutting-edge, whether off-label is appropriate. There ought to be a standard that says the defendant doctor subjectively believed that he or she was treating a medical condition that presented to him or her by the patient. That's the standard. Ruan, I believe, was meant to be a sea change, changing the way these cases are prosecuted and the instructions that are given. So the 100 years of history, and referencing back to cases like Moore, are important historical contexts, but we're in a new era, I believe. It was a sea change in the sense that now you're not getting a 41 prosecution for negligence. There's an additional mens rea. You're stacking on top of negligence. I know that I'm acting outside the course of professional practice. I am sympathetic to some of the first principles arguments you're advancing. I think Gonzalez is a big problem for you, though, with respect to the delegation argument. Gonzalez is the seminal case for when the regulation parrots the statute, you don't get our deference. If it's parroting the statute, then it seems to me that the statute is your problem. As a lower court, I'm not sure how we can question the Supreme Court saying that this is all tracing back to the statute itself. Well, I'd say that the regulation does not parrot the statute. And so I do believe that the non-delegation issue is important. I think it's, you know, I cite in the brief that Congress does not hide elephants in mouse holes. I mean, the Congress delegated to Health and Human Services powers to regulate, and also the Attorney General, but not to define what the crime is. They allow the Attorney General to make decisions on whether something moves from Schedule 2 to Schedule 3, but it doesn't allow the Attorney General's office, who is the prosecutorial function, to also define and change, in my opinion, change the statutory language. I understand Mr. Pratt's frustration maybe with others, but I did not say that the objective medicine has no place in these cases. It does. It is permissible to come in, again, as circumstantial evidence to prove a defendant's subjective intent in whether he or she properly prescribed or prescribed a medication for the condition that was presented to him by the patient. I guess I'm going to ask one question, just to have you follow up on what you were saying. You said that you don't think that the reg actually does parrot the statute. I want you to expound on that, because I think that in Gonzalez they point it to specific other portions of Title 21 that uses this language. So what do you mean when you say that it doesn't parrot the statute? Well, Your Honor, I'm going to go back to the language we've been talking about, the objective language, the legitimate medical purpose, the usual course of medical profession. I believe that that is not part of the statute. That is the regulation. The way the case law has developed, it permits, and again, with a different standard in the past, by the way, but the objective criteria have permeated their way into these cases. So it is permissible for it to come in, but I believe that Ruan has changed that landscape such that it cannot be definitional. And I know I'm repeating myself, but it cannot be part of the definition of authorized. The problem, to pick up on Judge Davis' question, if I might, you agree that the language of 1306.04 was the same in 2005 under Gonzalez as it is now? I do. And so the problem for you, I think, is that Gonzalez said for purposes of whether you're getting our deference, that provision followed from the statute for the reasons Judge Davis mentioned and they trace it to 29C and 830B3A2. So I think your response kind of to that framing. Yeah, with that framing, Your Honor, I still come back to, I believe that Ruan has changed where that fits into the case. And so it can't be part of the elements of the offense. It has to come in kind of, I don't want to say sideways, but we have to focus on what is the defendant's intent and when he wrote the prescription, did he believe that he was fulfilling a medical condition, treating a medical condition? If this objective evidence, we put in the stubbed toe argument that the government made in Ruan, if you prescribe opioids of a high potency for a stubbed toe, then all of this circumstantial evidence, expert testimony can come in to say that was entirely unreasonable and that goes to disproving the defendant's subjective intent. Great. Thank you, Counsel. Thank you, Judge. Mr. Danini, my note here says that you are acting as a CJA counsel, so the court thanks you. And I thank both parties for your thorough briefing and your very thorough arguments also.